Erik B. Ryberg (Arizona Bar No. 023809)
312 S. Convent Ave.
Tucson, AZ 85701
Tel: (520) 622-3333
Fax: (520) 622-2406
ryberg@seanet.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>    Plaintiff,<br><br>    v.<br><br>JAMES KENNA, in his official capacity as Arizona State Director of the BUREAU OF LAND MANAGEMENT<br><br>    Defendant. | No.  2:10-cv-1096<br><br>**COMPLAINT**<br><br>**(Declaratory and Injunctive Relief)** |

Plaintiff, by and through their attorney, Erik B. Ryberg, allege as follows:

**INTRODUCTION**

1.    This action challenges a land-use plan that has been approved by the Arizona State Director of the Bureau of Land Management ("BLM") for the Yuma Field Office of the BLM.  The land-use plan, or "Resource Management Plan," will govern how the BLM will manage about 1.3 million acres of extremely arid desert lands near Yuma, Arizona.  These public lands are used for a variety of purposes including motorized and non-motorized recreation, hunting, backpacking, sightseeing, wildlife viewing, and protection of cultural and archaeological sites.  The landscape is also used for commercial and industrial purposes such as mining, energy transmission, and livestock grazing.

- 1 -

COMPLAINT

2. The Resource Management Plan at issue here was prepared in accordance with the Federal Land Policy and Management Act, which requires the BLM to develop and maintain land use plans. 43 U.S.C. § 1712(a). This act also requires the BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). (The BLM has also adopted land use planning regulations at 43 C.F.R. § 4100 et seq. and rangeland management regulations at 43 C.F.R. § 4180 et seq. that mandate protection for natural resources.)

3. Because of the size of the landscape involved and the sweeping management implications of this multi-year land-use plan, the BLM prepared an environmental impact statement to analyze the effects of the agency's new planning regime on the environment. This impact statement was prepared in accordance with the National Environmental Policy Act, or NEPA, at 42 U.S.C. § 4321 et. seq.

4. Unfortunately, the Bureau of Land Management all but completely ignored the potential environmental impacts of one of the most important elements of its plan: the decision to allocate over 600,000 acres of this arid landscape to year-long livestock grazing.

5. It is past dispute that commercial livestock grazing in the extremely arid Sonoran Desert ecosystems (there is no perennial water at all in the areas slated for livestock grazing in the Yuma resource Area) can have serious, chronic, long-term, and possibly permanent effects to the natural landscape.

6. But the BLM all but completely failed to analyze or acknowledge these impacts in its environmental impact statement. In fact, only a half dozen or so pages in two thick volumes are devoted to discussing the effects of livestock grazing, and the bulk of those pages involve the potential economic impacts to livestock operators from permitting or not permitting livestock grazing to occur.

COMPLAINT

7. Western Watersheds Project seeks declaratory and injunctive relief to remedy the BLM's violations of law in its failure to analyze, disclose, and take a hard look at the effects of commercial livestock grazing in this harsh, hot, dry, and yet ecologically diverse and important ecosystem.  Plaintiff Western Watersheds Project brings this challenge under the National Environmental Policy Act,  42 U.S.C. § 4321  et seq. and its regulations, and the Administrative Procedure Act ("APA") 5 U.S.C. § 701 et. seq.

## JURISDICTION AND VENUE

8. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because this action arises under the laws of the United States, including the National Environmental Policy Act, 42 U.S.C. §  4321 et. seq., the Administrative Procedure Act, 5 U.S.C. § 701 et. seq., the Declaratory Judgment Act, 28 U.S.C. § 2201 et. seq., and the Equal Access to Justice Act, 28 U.S.C. § 2214 et. seq.  An actual, justiciable controversy now exists between the plaintiff and the defendant, and the requested relief is proper under 28 U.S.C. §§ 2201 et. seq. and 5 U.S.C. §§ 701-706.

9. This Court may grant the relief requested under 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief) and 5 U.S.C. § 701-706 (APA).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(2) because a substantial part of the events giving rise to Western Watersheds Project's claims occurred in this district, Defendants have offices and manage lands within the district, and because the plaintiff maintains an office in this district.  The project occurs in and was authorized in this judicial district.

## PARTIES

11. Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a non-profit membership organization headquartered at the Greenfire Preserve in Custer County, Idaho, with offices and staff in Salmon, Hailey, McCall and Boise, Idaho; and also in Arizona,

- 3 -

COMPLAINT

California, Montana, Wyoming, and Utah. WWP is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP, as an organization and on behalf of its more than 1,400 members, is concerned with and active in seeking too protect and improve the wildlife habitat, soil productivity, riparian areas, water quality, and other natural resources and ecological values throughout the West, including Arizona. WWP is also active in monitoring ecological conditions in Arizona, including the Yuma Field Office; in reviewing and commenting upon agency grazing and other resource decisions; in advocating for the protection of wild populations of bighorn sheep, desert tortoises, and other desert wildlife; and in publicizing the ecological effects of grazing in this region.

12.     WWP has actively participated in management of livestock grazing in the Yuma Field Office and other Arizona State BLM offices through letters, comments, field trips, and administrative protests of BLM actions. WWP has taken many opportunities to express its concerns over management of the Arizona's BLM lands. WWP, and its staff and members, use and enjoy the wildlife, public lands, and other natural resources managed by the Yuma Field Office for many health, recreational, scientific, spiritual, educational, aesthetic, and other purposes. WWP and its staff and members pursue activities such as hiking, wildlife viewing, biological and botanical research, photography, and spiritual renewal on the subject BLM lands. WWP and its staff and members also derive personal enjoyment, educational, recreational, and aesthetic benefits from observing desert wildlife in their native habitat, and observing desert landscapes in a natural, undegraded condition. Livestock grazing that degrades this fragile ecosystem and threatens animal populations, soil conditions, and vegetation, impairs the use and enjoyment of this public landscape by WWP staff and members.

COMPLAINT

13. WWP staff, members, and supporters will continue to visit the subject lands managed by the Yuma Field Office of the BLM in the future for many purposes such as hiking, wildlife viewing, photography, scientific study, spiritual renewal, and to otherwise enjoy the natural scenery and beauty of the Yuma Field Office lands.  WWP, both organizationally and on behalf of its staff, members, and supporters, has an interest in the preservation and protection of the ecology of the Yuma area BLM lands, which interest is directly harmed by Defendant's actions and inactions challenged herein.

14. The above-described conservation, recreational, scientific, and aesthetic interests of WWP and its staff, members and supporters have been, are being, and, unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendant's violations of law.  WWP has no adequate remedy at law, and thus the requested relief is appropriate.

15. Defendant James Kenna is named in his official capacity as the Arizona State Director of the Bureau of Land Management.  Mr. Kenna is the official responsible for approving the Yuma Field Office Resource Management Plan.

## STATEMENT OF FACTS

16. Pursuant to the requirements of the Federal Land Policy and Management Act, the BLM prepared a new Resource Management Plan, or RMP, for the Yuma Field Office, and submitted a draft of that plan for public review in 2007.  Western Watersheds Project provided comments on the plan on March 15 of 2007.

17. In April of 2008 the BLM completed an Environmental Impact Statement of its plan, and Western Watersheds Project filed an administrative protest of that plan on May 9, 2008 in accordance with the BLM's administrative review procedures at 43 C.F.R. 1610.5.

COMPLAINT

18. On January 29, 2010, Arizona State BLM Director James G. Kenna denied the administrative protest and signed a Record of Decision approving the RMP.

19. The RMP is a long-term land-use plan that governs management decisions in the approximately 1.3 million acres of lands managed by the Yuma Field Office of the BLM. The landscape is generally bordered by the Colorado River to the West, the Mexico-America border to the South, the Maricopa County line to the East, and, for the most part, Interstate 10 in the North. This landscape encompasses the Kofa Wildlife Refuge, all or parts of five designated Wilderness Areas, the Lower Colorado River, and the Lower Gila River.

20. One feature of the RMP is land allocation. The RMP allocates 643,000 acres, in five separate grazing allotments, to livestock grazing. The allotments are the Eagletail, K Lazy B, Bishop, Crowder-Weisser, and Calhoun. Each of these allotments has been available for grazing for decades; the RMP allocation does not make any change to the allotments as they have historically been grazed.

21. The BLM describes the landscape has having "hot summers, mild winters, low rainfall, high evaporation rates, and low humidity. Approximately 110 days per year have average temperatures over 100 degrees. . . . The average annual precipitation within the planning area is 3.5 inches . . .." Yuma Field Office Proposed RMP and EIS Vol. 1 at ES-15. This is less than half the annual rainfall of Phoenix, Arizona; the Yuma Field Office manages some of the most arid lands in North America.

22. Some wildlife thrives in this environment. The desert tortoise, for example, is one, and is found in the project area. Sonoran pronghorn, though "rare and infrequent," have also been found there. Desert bighorn sheep, the Southwestern willow flycatcher, the Sonoran Desert bald eagle, the burrowing owl, cactus ferruginous pygmy owl, and flat-tailed horned lizard are all species that, because of their rarity, enjoy a special legal or administrative status and occupy or have habitat within the project area.

COMPLAINT

23. But these species are all negatively affected by livestock grazing either through trampling, erosion of the soil, competition for scarce forage, or, most importantly, through the introduction and spread of invasive, non-native vegetation that alters the natural fire regime and can result in widespread and permanent damage to the Sonoran desert.

24. Livestock grazing in arid environments has significant deleterious effects on soil quality and long-term soil productivity. These effects include losses to biological soil crusts, diminished infiltration rates, and accelerated erosion. Studies have also found profound adverse impacts from livestock trampling microbiotic crusts, which in turn affects soil's ability to fix nitrogen and support vegetation that relies on that nutrient. These effects can be long lasting or even permanent, because soil development and nutrient-cycling in arid environments is a slow and fragile process. This is especially significant in areas of low precipitation like the Yuma Resource Area because soil structure influences the ability of the land to absorb and retain water, which in turn limits moisture available to vegetation.

25. Aboveground, livestock grazing effects are similarly significant. Livestock impact vegetation communities directly through trampling and mechanical disturbance, indirectly through impacts to soil and hydrologic regimes, and through the associated range developments. Grazing can disrupt ecological succession and community structure, and change diverse vegetation communities with plants of various ages into homogeneous monocultures. Scientists have reported that livestock grazing can reduce biomass and cover, decrease vegetation diversity, and decrease seedling survival.

26. Livestock grazing has also been linked to increases in the distribution and abundance of non-native vegetation species, many of which can be extremely detrimental to the Sonoran desert ecosystem. These species are nearly impossible to eradicate once they are in place, and they pose one of the largest threats to ecosystem integrity. The most profound effect of non-native plant species is their tendency to disrupt the natural ecosystem through increased flammability. Invasive alien grasses especially benefit from fire,

COMPLAINT

displacing native species and leading to habitat type conversions from desert to annual grasslands.

27. Species such as buffelgrass, Mediterranean grass, red brome, and Sahara mustard, which are all found in the Yuma Resource Area, increase the abundance of fine fuels and increase the risk of wildland fires. Livestock grazing is a known vector for the spread of invasive species, either through seed transport through animal fur or feces, or due to disturbance from soil trampling. Worse, livestock's destruction of soil crusts facilitates establishment of invasive species.

28. Changes in vegetation communities affect the food that is available to wildlife, and this has consequences up the food chain. For example, desert tortoise diets can be impaired when non-native species predominate formerly native ecosystems. Livestock also compete with animals for the sparse vegetation that is available, and the BLM has identified competition for forage between livestock and desert bighorn sheep and desert tortoise on two allotments within the Yuma Project area. There is also a risk of disease transmission between bighorn and livestock on these same allotments; interactions between bighorn sheep and livestock can compromise bighorn health, possibly due to nutritional deficiencies or stress.

29. Because of the potential for commercial livestock grazing to impair natural resources, the BLM has adopted a body of standards called the Arizona Standards for Rangeland Health.  These standards require, among other things, that management activities such as livestock grazing "maintain or promote ground cover that will provide for infiltration, permeability, soil moisture storage, and soil stability appropriate for the ecological sites."  The standard also requires that the ground cover maintain soil organisms, plants and animals, and nutrient cycles, and that sufficient forage remain for wildlife.

30. But in its decision to allocate over 600,000 acres of this landscape to livestock grazing, the BLM did not analyze whether this livestock grazing will meet or has met those

standards in the past. Nowhere are there studies that show that ground cover has been maintained, or that soils are healthy and stable, or that nutrient cycles are being maintained.

31.  The BLM stated that it would conduct these studies prior to October 1, 2009, and thus prior to adopting the RMP and allocating this land to livestock grazing. But the studies were not done, and thus the lands have been allocated to continued grazing without conducting the analysis to determine whether grazing is appropriate there.

32.  What studies the BLM can point to are very old. Soil studies for the allotments are nearly 30 years old. There are no studies to monitor long-term soil or vegetation trend and condition. There are no current data to support the BLM's conclusion that livestock grazing in the area is benign, or to support the determination to allocate so much of this environment to livestock grazing.

33.  Because the BLM did not collect the needed data to take a hard look at the current environment, it could not logically make a determination about the effects on the environment from livestock grazing in 615,000 acres that it intends to continue grazing. And because it calls for no changes in that grazing, it did not evaluate a reasonable range of alternatives to the grazing, such as a reduction in season of use, numbers, or land area that is to be grazed; or a declaration that grazing would not continue until required monitoring is finally completed.

**FIRST CLAIM FOR RELIEF**

**(VIOLATION OF NEPA AND THE APA)**

34.  Plaintiffs reallege and incorporate by this reference the allegations contained above as though fully set forth herein.

- 9 -

COMPLAINT

35. The fundamental purpose of the National Environmental Policy Act is to ensure that federal actions receive appropriately detailed environmental review. 42 U.S.C. § 4332. The NEPA requires federal agencies to take a "hard look" at their actions, and to assess the environmental impacts of those actions in a forthright and public manner. When analyzing projects that "may" have a significant effect on the environment, agencies are to consider various alternatives to the project that might be environmentally preferable to the original proposal. 42 U.S.C. § 4332(A); 40 C.F.R. § 1502.14.

36. NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") prior to taking an action that could "significantly" affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

37. Environmental Impact Statements are required to be prepared for actions that may have a significant effect on the environment; they exist to show that the agency took a "hard look" at the effects of its actions and revealed those actions to the public and the decision-maker.

38. NEPA and its implementing regulations require federal agencies like the BLM to conduct a thorough and public analysis of the environmental consequences of proposed federal actions, and this analysis must use high quality information and accurate scientific analysis. 40 C.F.R. 1500.1(b). The analysis must include a consideration of a reasonable range of alternatives. *Id. at* 1502.14.

39. Defendants violated the NEPA and its implementing regulations by preparing and relying on the defective EIS for the Yuma Field Office RMP.

40. Defendants violated NEPA by failing to take a "hard look" at the direct, indirect, and cumulative impacts of livestock grazing in the subject area.

COMPLAINT

41. Defendants violated NEPA by failing to take a "hard look" at the previous and existing impacts of livestock grazing, which has been ongoing for decades in the subject area.

42. Defendants further violated NEPA by failing to use high-quality information and data, by failing to obtain that data when it was readily available, and by misrepresenting that they would obtain it prior to finalizing the RMP.

43. Defendants did not consider a range of alternatives in the EIS that would limit livestock grazing to areas where it has been shown through data to be benign, or to consider specific grazing measures that would protect sensitive resources in the Yuma Field Office landscape.

44. Defendant's approval of the Yuma Field Office RMP is arbitrary, capricious, an abuse of discretion, and not in accordance with law under the NEPA and the Administrative Procedures Act, and has cause or threatens serious prejudice or injury to the rights and interests of Plaintiff WWP and its members and staff.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Western Watersheds Project respectfully requests that the Court enter judgment providing the following relief:

1. Order that the Defendants violated NEPA and its implementing regulations and or the Administrative Procedure Act in preparing and adopting the Yuma Field Office RMP and its associated EIS; decision to continue to use the challenged sheep driveways is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

2. Reverse and remand the challenged RMP;

3. Enter declaratory and/or injunctive relief requiring Defendants to undertake comprehensive and legally valid NEPA analysis;

COMPLAINT

4.   Enter such other declaratory and/or injunctive relief as WWP may specifically request hereafter;

5.   Award Plaintiff its reasonable costs, litigation expenses, and reasonable attorney's fees associated with this litigation and the related administrative proceedings pursuant to the Equal Access to Justice Act, 28 U.S.C. 2412 et. seq., and/or all other applicable authorities; and/or

6.   Provide such other relief as the court deems just and proper to remedy Defendant's violations of law, vindicate the interests of WWP and the public, and preserve and protect the public lands and resources at issue.

COMPLAINT

Dated this 19th day of May, 2010.

s/Erik B. Ryberg
Erik B. Ryberg

Attorney for the Plaintiff

COMPLAINT