**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Western Watersheds Project, | ) | No. CV-10-1096-PHX-SMM |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| James Kenna, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court are Plaintiff Western Watersheds Project's ("Plaintiff") Motion for Summary Judgment (Doc. 18) and Defendants James Kenna and United States Bureau of Land Management's ("Defendants") Cross-Motion for Summary Judgment (Doc. 22). The matters are fully briefed. (Docs. 23, 24, 25). Having considered the parties' memoranda and other submissions, the Court finds the following.

## BACKGROUND

Plaintiff brought this action under the National Environmental Policy Act ("NEPA") to challenge the adequacy of a Resource Management Plan ("RMP") and Environmental Impact Statement ("EIS") issued by Defendants. (Doc. 1). Defendants issued the RMP in 2010 after performing site evaluations in 2002 and preparing an EIS in 2003. (Doc. 18-1 ¶ 15). The RMP describes a long-term management plan for about 1.3 million acres of land in southwestern Arizona and parts of California. (Doc. 22-1 ¶¶ 1, 19). The claims in this action involve a 640,000-acre area within that region that has been divided into five livestock

grazing allotments leased to private ranchers. (Doc. 1 ¶ 20; Doc. 18-1 ¶ 5). This arid land is home to various wildlife and plant species. (Doc. 1 ¶¶ 21-23). Plaintiff is a non-profit organization with offices in several states, including Arizona, concerned with protecting the natural resources, wildlife habitat, and other ecological values that it contends are harmed by the continued availability of livestock grazing permitted by Defendants' RMP. (Doc. 1 ¶ 11).

Defendants' RMP authorizes continued livestock grazing on five of the sixteen allotments within the planning area. (Doc. 22-5 at 112). This leaves the remaining eleven allotments unavailable for grazing and reduces the total acreage available for grazing by 48 percent, although most of that land had not supported grazing for at least five years. (Doc. 22-5 at 112). When compared to the other alternatives, the action selected by Defendants minimized changes to the landscape, with respect to livestock grazing, and limited negative social impacts to the ranchers on those allotments. (Doc. 22-5 at 112).

**I.     Factual History**

**A.     The 2003 Environmental Impact Statement**

NEPA requires federal agencies to prepare an EIS prior to proposing actions in the RMP that will significantly affect the environment. 42 U.S.C. § 4321 et seq. The purpose of the EIS is to assess the potential environmental consequences of actions being considered by the agency, consider alternatives that might be environmentally preferable, and inform the public that potential consequences have been considered. See 42 U.S.C. § 4332(C)(i),(iii); Kern v. BLM, 284 F.3d 1062, 1066 (9th Cir. 2002). The assessments include "any adverse environmental effects which cannot be avoided" if the proposal is implemented. 42 U.S.C. § 4332(C)(ii). Defendants prepared this EIS "to analyze the effects of the agency's new planning regime on the environment." (Doc. 1 ¶ 3). The EIS analyzes the significant factors affecting the area at issue in this case. (Docs. 24-4, 24-5). A non-exhaustive list of these factors include: Land Health Standards, Special Designations Management, Vegetation Management, Special Status Species Management, Livestock Grazing, and Recreation

Management. (Doc. 22-5 at 4). With regard to the frequency of livestock grazing, Defendants' EIS refers to the Special Ephemeral Rule of 1968, which sets the criteria for ephemeral (seasonal) and perennial (year-long) grazing classification. The criteria include:

> 1. Rangelands are within the hot desert biome;
> 2. Average annual precipitation is less than eight inches;
> 3. Rangelands produce less than 25 pounds per acre of desirable forage grasses;
> 4. The vegetative community is composed of less than five-percent desirable forage species;
> 5. The rangelands are generally below 3,500 feet in elevation;
> 6. Annual production is highly unpredictable and forage availability is of a short duration;
> 7. Usable forage production depends on abundant moisture and other favorable climatic conditions; and
> 8. Rangelands lack potential to improve existing ecological status and produce a dependable supply of forage through intensive rangeland management practices.

(Doc. 22-4 at 137). The Ephemeral Rule criteria is applied "as individual allotments are evaluated for compliance with the Arizona Standards for Rangeland Health and Guidelines for Grazing Administration." (Doc. 22-4 at 137).

In completing the EIS, Defendants gathered public feedback regarding the proposed action via the notice and comment procedures set forth by NEPA and the Administrative Procedures Act ("APA"). (Doc. 22-5 at 153-54). The opportunity for feedback began on March 30, 2004 when Defendants published a Notice of Intent in the Federal Register. (Doc. 22-5 at 152). Notice of Availability was published on December 15, 2006, which initiated a 90-day public comment period. (Doc. 22-5 at 154). Additionally, Defendants held numerous open houses to inform the public of its proposed action. (Doc. 22-5 at 153). Ultimately, Defendants received more than 400 letters from individuals, agencies, and government officials providing feedback for the proposed action. (Doc. 22-5 at 152, 165).

**B.     The 2010 Resource Management Plan**

Plaintiff asserts that the primary purpose of the RMP is to "allocate land in the Yuma Resource Area." (Doc. 18-1 ¶ 2). According to Defendants, the RMP establishes goals for "the management of special designations, fish and wildlife habitat management, wild horse and burro management, recreation management, travel management, the maintenance of wilderness characteristics, and lands and realty." (Doc. 22-2 at 2). Defendants attempt to reach these goals by evaluating a variety of alternative actions for the land area, then selecting a preferred alternative that balances "current and potential resource uses with the need to protect resources, as well as consideration of the human environment." (Doc 22-2 at 21).

The discussion of alternatives "is the heart of the [EIS]." 40 C.F.R. § 1502.14. Defendants' RMP discusses four alternative actions in addition to the implemented action. (Doc. 22-2 at 19). Each alternative focuses on a particular component of the land planning process. (Doc. 22-2 at 18). Alternative A is a "no action alternative" that serves as a baseline to identify the potential environmental consequences of the other alternatives. (Doc. 22-2 at 20). Alternative B "generally placed an emphasis on consumer-driven uses . . . It identified areas most appropriate for these various uses." (Doc. 22-2 at 20). Alternative C combines natural process and active management techniques to allow "visitation and development within the planning area, while ensuring that resource protection was not compromised." (Doc. 22-2 at 20). Alternative D emphasized preserving the natural and cultural resources of the area, discontinued livestock grazing, and limited public use of the area. (Doc. 22-2 at 20). Alternative E, the implemented action, attempts to respond to the concerns recognized during the planning process, while providing an "optimal balance between authorized resource use and the protection and long-term sustainability of sensitive resources within the planning area." (Doc. 22-2 at 20).

The RMP also considers several categories of natural resources, and the ways in which the RMP's actions impact each one. (Doc. 22-2 at 45-47). The resources considered

- 4 -

include: water quality, soil, vegetation, threatened, endangered, and special status species, wilderness characteristics, and livestock grazing. (Doc. 22-2 at 45-47). With respect to livestock grazing, the RMP states that "[l]ivestock grazing will be managed through existing laws, regulations, and policies . . . They include a strategy for ensuring that proper grazing practices are followed, while preserving habitats for sensitive plant and wildlife species." (Doc. 22-2 at 47).

## II.     Procedural History

On May 19, 2010, Plaintiff brought suit challenging the action implemented by Defendants' RMP related to more than 600,000 acres of land within the planning area for livestock grazing. (Doc. 1 ¶¶ 4, 6). On May 16, 2011, Plaintiff filed a Motion for Summary Judgment, asserting that Defendants: (1) did not meet their duty under NEPA to consider a reasonable range of alternative actions; (2) did not take a hard look at the environmental consequences of their actions because the RMP relied on stale and incomplete data; and (3) violated NEPA's public disclosure requirements by misrepresenting the environmental effects of the implemented action. (Doc. 18). On July 5, 2011, Defendants filed a Cross-Motion for Summary Judgment contending that Plaintiff has not met its burden of controverting Defendants' "specialized findings and analysis" in the RMP and the EIS. (Doc. 22 at 1).

## LEGAL STANDARDS

## I.     Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the non-movant must set out specific facts showing a genuine dispute for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

## II.     Administrative Procedures Act

Judicial review of federal agency action is provided by the APA, 5 U.S.C. § 706, which states in pertinent part that a "reviewing court shall . . . hold unlawful and set aside agency actions, findings and conclusion found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . (D) without observance of procedure required by law; (E) unsupported by substantial evidence . . .; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2).

The Court finds agency action is or is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance" with § 706, after considering whether "the decision was based on a consideration of the relevant factors and whether there has been a

clear error of judgment." 5 U.S.C. § 706(2); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). The evidence must demonstrate that Defendants reasonably believed there were no feasible alternatives to its challenged action, or that additional alternatives also involve problems. See Laguna Greenbelt, Inc. v. U.S. Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994) (citing 40 C.F.R. § 1502.14(a)).

Both the APA and NEPA require agencies to take a "hard look" at the consequences of proposed action prior to making a final decision. Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002). An agency has taken a hard look at the effect of their actions when it can be shown that the EIS includes a "full and fair discussion of significant environmental impacts" of a proposed action and when the conclusions of the EIS are based on informed decision making. Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Interior, 606 F.3d 1058, 1072 (9th Cir. 2010) (quoting 40 C.F.R. § 1502.1).

**DISCUSSION**

NEPA exists "to insure that an agency, while seeking to fulfill some other substantive agency goal . . . , considers the impact on the environment." Ariz. Cattle Growers Ass'n v. Cartwright, 29 F.Supp.2d 1100, 1109 (D. Ariz. 1998). Under NEPA, federal agencies are required to "identify and develop methods and procedures" that ensure environmental considerations are made in conjunction with economic and technical considerations throughout the decision making process. 42 U.S.C. § 4332(B). NEPA's requirements apply to "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" and are appropriately applied in this matter. 42 U.S.C. § 4332(C).

In order to prevail under a NEPA claim, Plaintiff must show that Defendants acted arbitrarily when preparing the EIS. Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976); Friends of the Earth v. Hintz, 800 F.2d 822, 832 (9th Cir. 1986); Ariz. Cattle Growers Ass'n, 29 F.Supp.2d at 1115. NEPA is a procedural regulation and claims against substantive outcomes

are not proper under NEPA. Winter v. NRDC, Inc., 555 U.S. 7, 23 (2008); Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). Thus, Plaintiff's claims are not evaluated based on the outcome of Defendants' action, but rather on the procedures Defendants took prior to implementing the action.

Plaintiff asserts in its Motion for Summary Judgment that Defendants acted arbitrarily and capriciously when implementing action under the RMP by: (1) not considering an obvious and reasonable alternative to the implemented grazing plan; (2) relying on incomplete evaluations when preparing the management plan which would prevent the agency from meeting the hard look standard; and (3) violating the public disclosure requirement of NEPA because information regarding the environmental consequences of the proposed action was missing or misrepresented in the EIS. (Doc. 18 at 11-17). Defendants' Cross-Motion for Summary Judgment contends that Plaintiff has failed to meet its burden in challenging the RMP and EIS. (Doc. 22 at 1).

## I. Consideration of Reasonable Alternatives to the Implemented Action

Plaintiff asserts that Defendants' actions were arbitrary and capricious under NEPA because the RMP did not evaluate a reasonable range of alternatives, specifically an alternative that considered a reduction in livestock grazing, which is the "one alternative that would actually make a difference in the condition of the landscape, and the one alternative that every allotment evaluation" recommended. (Doc. 18 at 13-14). Plaintiff recognizes that Defendants considered four alternatives to the implemented action. (Doc. 18 at 13). However, Plaintiff asserts that this does not equal a reasonable range because all of the alternatives considered in the EIS ultimately provide the same results on the land and the only "difference between the alternatives is . . . the inclusion or exclusion of allotments." (Doc. 18 at 13).

Defendants' Response contends that Plaintiff's claim is "premised on three mistaken assertions" that prevent Plaintiff from meeting its burden. (Doc. 23 at 16). First, Defendants contend that Plaintiff's claim is directly contradicted by the record because Defendants

"specifically considered an alternative to its final RMP that would result in the discontinuation of livestock grazing." (Doc. 23 at 16). Defendants further dispute Plaintiff's claim, contending that the alternatives considered in the EIS and RMP advance the goals of the Taylor Grazing Act and the Public Rangelands Improvement Act of 197 which include improving "the condition of public rangeland . . . in accordance with management objectives and the land use planning process." (Doc. 23 at 20-21). Second, Defendants contend that the agency's expert evaluations simply made recommendations regarding a reduction in grazing, and did not make a final decision regarding the designated use of these lands. (Doc. 23 at 21).

NEPA does not require the Court to evaluate the substantive outcome of agency action. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). Courts are to evaluate if the agency went through the required procedures to consider alternatives, and should not evaluate the substantive outcome of those alternatives. See id. ("[I]t is well settled that NEPA itself does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed-rather than unwise-agency action."). When determining the range of reasonable alternatives, courts consider the stated goal and purpose of the project before the agency. Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Interior, 606 F.3d 1058, 1072 (9th Cir. 2010); City of Carmel-by-the-Sea v. Dep't of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997); City of Angoon v. Hodel, 803 F.2d 1016,1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").

The Court finds that Defendants have met their obligation under NEPA to consider a reasonable amount of alternatives in the EIS. First, the purpose of the EIS in question was to "provide direction for future land management actions" and "to analyze the environmental effects resulting from implementing the alternatives." (Doc. 22-4 at 24). Taking into account the strong presumption in favor of agency deference, this Court is not in a position to evaluate which alternative is most desirable or to determine the number of alternatives that the agency should have considered. See Kleppe, 427 U.S. at 412 (resolving issues of

feasibility of the proposed actions "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies"); Ariz. Cattle Growers Ass'n, 29 F.Supp.2d at 1119 (finding that agency action was not arbitrary and capricious when it failed to consider an exhaustive list of alternatives but did discuss some feasible alternatives and "the reasons [unselected alternatives] were eliminated." (quoting Laguna Greenbelt, 42 F.3d at 524)).

However, given the purpose of the project, the Court finds that Defendants appropriately considered an adequate number of alternatives. See Nat'l Parks & Conservation Ass'n, 606 F.3d at 1072. The EIS considers four alternative plans of actions, including a "no action" alternative pursuant to 40 C.F.R. § 1502.14, which serves as a benchmark to evaluate the environmental consequences that result under other alternatives. (Doc. 22-2 at 20). The remaining alternatives consider different degrees of recreation, motorized vehicle use, and natural resource preservation. (Doc. 22-2 at 20). The selected action, alternative five, is intended to provide "an optimal balance between authorized resource use and the protection and long-term sustainability of sensitive resources within the planning area." (Doc. 22-2 at 20). The Court finds that Defendants have met their obligation under NEPA to consider a reasonable amount of alternatives because the five potential plans of action discussed in the EIS "provide direction for future land management," which was Defendants' goal when preparing the assessment. (Doc. 22-4 at 24).

Second, the Court finds that Plaintiff has not shown that Defendants were required to evaluate a variety of livestock grazing plans in the EIS' alternative discussion beyond Defendants' guarantee that individual grazing leases will be made in accordance with the range management goals referenced in the RMP. (Doc. 25 at 5). The EIS states in pertinent part that:

> [l]ivestock grazing would be managed through existing laws, regulations and policies. The plans would incorporate the statewide standards and guidelines . . . They would include a strategy for ensuring that proper grazing practices are followed, while preserving habitats for sensitive plant and wildlife species.

- 10 -

(Doc. 22-4 at 51). The Court finds that these considerations comport with Defendants' goal to "provide direction for future land management actions." See Nat'l Parks & Conservation Ass'n, 606 F.3d at 1072 (suggesting that courts consider agency goals and purpose when evaluating if a reasonable range of alternatives were considered). Pursuant to 43 C.F.R. § 4130.3 and Defendants' EIS, the Yuma Field Office ("YFO") is the appropriate entity to "specify . . . the period(s) of use, the allotment(s) to be used, and the amount of use . . . for every grazing permit or lease," at the appropriate time. (Doc. 22-4 at 133). Thus, Defendants' decision to renew grazing permits is not appropriately discussed in the RMP because allocation of grazing is done on an individual basis. (Doc. 22-4 at 133 (When the "permittee or lessee applies for grazing use, the YFO determines the amount and period of authorized use.")).

Therefore, the Court finds that Plaintiff has failed to meet its burden to demonstrate that Defendants violated NEPA's procedural obligation to consider a reasonable range of alternatives or to demonstrate that the alternative Plaintiff seeks to have implemented is appropriately discussed in the EIS.

## II.     Taking a "Hard Look" at the Effect of Agency Action

Plaintiff contends that Defendants relied on stale and incomplete data regarding livestock grazing and thus failed to comply with the "hard look" requirement. (Doc. 18 at 15). Plaintiff asserts that Defendants' findings in the EIS rely solely on site evaluations conducted in 2002, and therefore the data was stale at the time the EIS was prepared. (Doc. 18 at 15-16). Plaintiff further contends that the action in the RMP does not meet the hard look standard because Defendants' own experts' evaluations made recommendations that grazing availability be reduced from perennial to ephemeral grazing. (Doc. 18 at 15-16).

Defendants contend that Plaintiff fails to controvert the agency's specialized expertise because the 2002 site evaluations "were only a small part of a comprehensive decision-making" process and the EIS also relied on "its own expertise in analyzing the Arizona Rangeland Standards . . . and additional lease-specific environmental mitigation measures."

(Doc. 23 at 19). Additionally, Defendants contend that Plaintiff misstates the record because follow-up interviews with individual allotment holders were performed in 2006, following the 2002 site evaluations. (Doc. 23 at 19).

Under NEPA, the hard look standard involves an evaluation of whether the agency considered all relevant information when forming its decision, and if the agency followed the required procedures. Kleppe, 427 U.S. at 410; Marble Mountain Audubon Soc. v. Rice, 914 F.2d 179, 182 (9th Cir. 1990). Although deference to agency decisions that are "fully informed and well-considered" is appropriate, courts "need not forgive a 'clear error of judgment.'" Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211, (quoting Save the Yaak Comm. v. Block, 840 F.2d 714, 717 (9th Cir. 1988) and Marsh, 490 U.S. at 378). An adequate scope of analysis under NEPA includes consideration of "not only the proposed action, but also . . . connected actions, similar actions, and cumulative actions." See 40 C.F.R. § 1508.25(a)(1)-(2).

The Court finds that Defendants took the requisite hard look at their actions under NEPA because the conclusions in the RMP rely on agency expertise in Arizona Rangeland Standards, vegetation and soil management standards, wildlife and habitat management standards, soil studies prepared by the U.S. Department of Agriculture and Nature Conservancy in 1991, 1994, and 2004, and many other sources. (Doc. 23 at 23). Defendants' experts have collected "an inventory of data and information, which is an ongoing activity and not governed solely by the planning process." (Doc. 22-4 at 45). Even without agency deference, NEPA does not establish a time frame for agency data collection and therefore, Plaintiff's claim that Defendants relied on stale data is not relevant to the Court's analysis of whether the agency took a hard look at the consequences of the implemented actions. See 42 U.S.C. § 4321.

Plaintiff's contention that the RMP does not provide complete evaluations of environmental consequences is unavailing as Defendants' EIS incorporated a sufficient amount of data to justify the hard look requirement. (Doc. 22-5). Regarding the effects of

livestock grazing, Defendants' EIS provides a summary of existing grazing guidelines and compares the acres available for grazing under each alternative in the EIS. (Doc. 22- 4 at 132-34). The EIS outlines the criteria for ephemeral grazing and states that "individual allotments are evaluated for compliance with the Arizona Standards for Rangeland Health and Guidelines for Grazing Administration." (Doc. 22-4 at 137). These standards have been approved by the Secretary of the Interior and were "developed to identify the characteristics of healthy ecosystems on public lands and the management actions that promote them." (Doc. 22-4 at 64). Further, Defendants appropriately incorporated the Land Health Standards and Guidelines for Grazing Administration in their analysis in the EIS, which comports with Defendants' experts' recommendation to reduce livestock grazing.

Therefore, the Court finds that Plaintiff has failed to demonstrate that Defendants violated NEPA in gathering the information incorporated into the RMP.

## III.     Compliance With NEPA's Public Disclosure Requirement

Plaintiff contends that Defendants misled the public regarding the environmental effects of livestock grazing because the EIS did not include the agency's expert recommendations to reduce grazing. (Doc. 18 at 17). Further, Plaintiff asserts that "any member of the public who inquired about the source of BLM's contention that no changes should be made in the grazing regime was given palliative misrepresentations about the condition of the land and what the data showed." (Doc. 18 at 17). The EIS states that "Arizona's Standards for Rangeland Health and Guidelines for Grazing Administration (1997) is incorporated into the RMP under all alternatives." (Doc. 22-4 at 28). As stated above, these standards comport with agency recommendations to reduce grazing and the standards are applied during individual lease renewals.

One of the purposes of NEPA's requirement for agencies to prepare an EIS is to ensure that the agency has informed the public of the available alternatives that can minimize adverse impacts on the environment. 40 C.F.R. § 1502.1. Defendants held four open houses to hear public concerns regarding the plan and hosted four additional workshops focused

entirely on the alternative development process. (Doc. 22-5 at 152). Ultimately, Defendants received more than 400 letters during the public disclosure period. (Doc. 22-5 at 165). The amount of public feedback regarding the information in the EIS demonstrates that Defendants met their duty to inform the public about the consequences of the proposed action. See Balt. Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S. 87, 98 (1983) (finding that the agency met NEPA's public disclosure obligation when the "sheer volume of proceedings . . . is impressive" and when the EIS adequately disclosed substantial risks of the proposed action).

Therefore, the Court finds that Plaintiff has not produced sufficient evidence to show that Defendants' communications with so many agencies, individuals, and interest groups during the public disclosure process was misleading or constituted a procedural error.

## CONCLUSION

Plaintiff has failed to demonstrate that Defendants did not comply with all procedural requirements under NEPA, even if the substantive outcome of Defendants' action was undesirable to Plaintiff. Further, Plaintiff has not shown that Defendants acted arbitrarily and capriciously when implementing the action described in the RMP.

Accordingly,

**IT IS HEREBY ORDERED GRANTING** Defendants' Cross-Motion for Summary Judgment (Doc. 22).

**IT IS FURTHER ORDERED DENYING** Plaintiff's Motion for Summary Judgment (Doc. 18).

DATED this 21st day of November, 2011.

_____
Stephen M. McNamee
United States District Judge